IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____  )
OPEN TOP SIGHTSEEING USA,INC.          )
50 F St NW, Suite 101                              )
Washington DC, 20001,                          )
   and                                     )
            )
CITY SIGHTSEEING WASHINGTON D.C., INC. )
 d/b/a BIG  BUS TOURS                    )
5500 Tuxedo Road                               )
Tuxedo, Maryland 20781,                     )
    Plaintiffs,                     )
   v.                                         ) COMPLAINT FOR DAMAGES
            ) AND INJUNCTIVE RELIEF
MR. SIGHTSEEING, LLC                      )
 d/b/a CITYSIGHTS DC                    )
Registered Agent: 715 Saint Paul Street   )
Baltimore, MD 21202                          )
   and                                     )
            )
ANDERS NIELSEN                             )
5001 Landons Bequest Lane                 )
Bowie, Maryland  20720,                     )
   and                                     )
            )
GABRIEL THOMAS                           )
1635 18th Street S.E., Apt #301            )
Washington, DC  20020,                     )
   and                                     )
            )
RICARDO TYSON                             )
5502 62ND Avenue                            )
Riverdale, Maryland 20737,                 )
            )
    Defendants.                   )
_____  )

## VERIFIED COMPLAINT

   Plaintiffs Open Top Sightseeing USA Inc. and CitySightseeing Washington DC, Inc.

d/b/a  Big Bus Tours (hereinafter collectively "Big Bus" or "the Company"), by and through

undersigned counsel, file this complaint against Defendants, Mr. Sightseeing, LLC d/b/a

CitySights, DC, Anders Nielsen, Gabriel Thomas, and Ricardo Tyson and (collectively, the "Defendants") and request that the Court enter judgment and relief in their favor against Defendants on the grounds and in the manner and amounts set forth herein.

## THE PARTIES

1.     Open Top Sightseeing USA Inc. is a Delaware corporation with its principal place of business in Washington, DC.

2.     CitySightseeing Washington DC, Inc. d/b/a Big Bus Tours is a New York corporation with its principal place of business in Hyattsville, Maryland.

3.     Mr. Sightseeing LLC is a Delaware corporation with a principal place of business in New York.  Mr. Sightseeing LLC conducts business in the Washington Metro DC area under the name of CitySights DC.

4.     Defendant Anders Nielsen is a resident of the State of Maryland.

5.     Defendant Gabriel Thomas is a resident of the District of Columbia.

6.     Defendant Ricardo Tyson is a resident of the State of Maryland.

## JURISDICTION AND VENUE

7.     This action arises under the Lanham Trademark Act 15 U.S.C. §§ 1051 et seq. (the "Lanham Act"). Accordingly, this Court has federal question jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1338(a).

8.     This court has supplemental jurisdiction over Big Bus' state law claims pursuant to 28 U.S.C. §1367.

9.     Venue for this action is proper in this District pursuant to 29 U.S.C. §1391(b) & (c).

10.     Mr. Sightseeing LLC is subject to personal jurisdiction in this judicial district

because, on information and belief, it does and/or transacts business within the District of Columbia and has made and established contacts sufficient to permit the exercise of personal jurisdiction here.

## **FACTUAL BACKGROUND**

11.     The Plaintiff, Big Bus, is the largest operator of open-top sightseeing tours in the world.

12.     Around the world, Big Bus provides sightseeing tours in 16 cities across three continents.

13.     The Company's current portfolio of cities in which it operates includes Abu Dhabi, Budapest, Dubai, Hong Kong, Istanbul, Las Vegas, London, Miami, Muscat, New York, Paris, Philadelphia, San Francisco, Shanghai, Vienna and Washington DC.

14.     Big Bus' success has derived from its unique sightseeing formula, which has been specifically designed to provide a flexible approach to city discovery.

15.     Every city is different, so Big Bus carefully tailors and customizes its tours to showcase the buildings, monuments, history, points of interests and attractions that make a city unique and works to develop specialized itineraries and routes for its customers.

16.     The tours include informative and entertaining commentary, which explains a City's history, provides interesting facts and anecdotes and points out significant buildings, monuments, architecture and landmarks as well as local events and places of interest such as wineries, shopping centers, museums, restaurants and markets.

17.     For both tourists and residents alike, the Big Bus guides pride themselves on revealing something fascinating and new to every customer.

18.     Big Bus also pays for all of its tour guides to attain certification from the District of Colombia in order for them to perform guiding duties.

19.     To develop and refine its tours, the Company gathers, compiles and synthesizes local historical knowledge, interesting trivia, and insider information and develops expertise relevant to each locality, such as knowledge of local cafés, bars, restaurants and eateries.

20.     Big Bus selects individualized stories, facts and information to both entertain and enlighten its customers so that they can find connection between the City of today and its past. Big Bus' motto is "Great Cities. Great Stories."

21.     The selected information is then turned into a written script for Big Bus tour guides to use.

22.     The commentary is available in 8 languages: English, French, German, Italian, Spanish, Portuguese, Chinese and Japanese.

23.     In the DC metro area, alone, Big Bus has developed four different tour routes tailored to its specific customers' needs and interests.

24.     For example, one loop includes the White House, U.S. Capitol, Air and Space Museum, Washington Monument, Jefferson Memorial, FDR Memorial and the Lincoln Memorial, and provides an introduction to the better known and iconic landmarks of Washington DC, while another provides the opportunity to shop in Georgetown and visit the National Cathedral, and still another loop takes visitors across the river to Arlington Cemetery and the Pentagon.

25.     Each of these loops is individually designed to show off different aspects, facts, attractions, history and landmarks of the City and provide photo opportunities at different stops and locations along the way.

4

26.     Customers may also buy a pass that includes all four loops.

27.     Wherever possible, Big Bus provides inclusions such as river cruises and museum entry that enhance the sightseeing experience.

28.     Big Bus is an authorized concessioner of the National Park Service and Department of Interior and provides the official sightseeing tour of the National Mall, a contract it won through a competitive bid process.

29.     Over the years, Big Bus has developed a complex international distribution network of global and local travel vendors and agents who market its services to specialized, targeted niche markets and customers.  These relationships developed over time, from years of interactions and experience and the conditions of these engagements in terms of commission, revenue, sales and compensation structure constitute highly confidential and proprietary information.

30.     At all relevant times, Big Bus has also marketed and sold its services to the general public in all geographic regions of the country via a public website created for that purpose.  The Company developed the website content itself, from its own internal resources, knowledge and proprietary information.

31.     Big Bus' fleet of buses bears a distinctive maroon color scheme with yellow lettering affiliated with the company that customers use to identify its services, both in Washington DC and around the globe.  Its website also utilizes the same colors scheme and logo.

**Mr. Nielsen's Employment and Separation Agreements**

32.     The Defendant, Anders Nielsen is the former Chief Executive Officer ("CEO") of Open Top Sightseeing USA.

33.     Because the position of CEO is unique and extraordinary in nature, and places the CEO in a position of confidence and trust with the customers, employees and executives of the Company, Mr. Nielsen's was required to enter into an Employment Agreement (hereinafter, the "Employment Agreement") as a condition of his employment.

34.     Mr. Nielsen's Employment Agreement memorialized the specific material terms and conditions of his employment, including compensation and vacation and contained certain restrictive covenants pertaining to Mr. Nielsen's use and disclosure of the Company's proprietary information during and after his employment with the Company and his post-employment client- and employee-solicitations and other competitive activities.

35.     Mr. Nielsen was required to sign the Employment Agreement as a condition of employment.  Mr. Nielsen understood that requirement at the time he was considering whether to accept the job offer.  Mr. Nielsen did not bring any questions or concerns about the agreement to the Company's attention.  Mr. Nielsen is also a sophisticated party, and the Company gave Mr. Nielsen ample time to consider whether to sign the agreement and to seek legal advice regarding the meaning and scope of its terms.

36.     Mr. Nielsen formally accepted Big Bus' job offer on December 1, 2009, by endorsing a copy and returning the signed copy of the Employment Agreement to the Company which counter-signed the agreement and retained a fully executed copy in Mr. Nielsen's personnel file located in its corporate offices.  A true and correct copy of the fully executed employment agreement is attached hereto as **Exhibit A.**

37.     Paragraph 6.3 of the Employment Agreement contains an express Non-Solicitation prohibition which restricted the ability of the CEO to hire, approach or attempt to

hire the Employees of Big Bus for a period of **two years** following the termination of his employment with the company.

38.     The Employment Agreement provides:

6.3 Non-Solicitation. Until two years following the termination of Chief Executive Officer's employment hereunder for any reason whatsoever, Chief Executive Officer shall not, as principal, proprietor, director, officer, partner, shareholder, executive, member, Chief Executive Officer, consultant, agent, independent contractor or otherwise, for himself or on behalf of any other person or entity (except the Company or any member of the Company Group, in either case at the Company's request), directly or indirectly:

6.3.2 hire, approach, counsel or attempt to induce any person who at any time within the two-year period prior to the termination of his employment was in the employ of the Company or any member of the Company Group for which Chief Executive Officer had operating responsibilities to leave such employment;

6.3.3 aid, assist or counsel any other person, firm or corporation to do any of the above.  **Ex. A** at Section 6.3.

39.     In March of 2012, Open Top Sightseeing USA elected to terminate Mr. Nielsen as the Company's Chief Executive Officer for unsatisfactory performance.

40.     At that time, the Company and Mr. Nielsen negotiated a separation agreement reflecting the terms of Mr. Nielsen's severance from the Company (hereinafter, the "Separation Agreement"), a copy of which is attached as **Exhibit B**.

41.     As part of that agreement, the Company elected to pay Mr. Nielsen an additional five months' salary, or an amount of $60,978.77, in exchange for a certain covenants and mutual releases of claims and permitted Mr. Nielsen to keep a Company laptop computer, pursuant to certain conditions, and keep the Company phone issued to him as well as purchase the Company car for his personal use.  **Ex. B**. at ¶¶ 3a, 9, 11, 13,14 and 15.

42.     Mr. Nielsen was allowed to keep his laptop contingent on "(i) the Company's inspection of such Laptop[s], and [his] execution of a certification that [he] did not have

Company data on the Laptop[s] and will not use or disclose Company data on such Laptops or otherwise." **Ex. B** at. ¶ 15.

43.     This certification was never provided, and the Company was never permitted to inspect the laptop computer.

44.     Pursuant to the Separation Agreement, Mr. Nielsen's employment with the Company was terminated effective June 30, 2012. **Ex. B**. at ¶ 2.

45.     Paragraph 21 of the Severance Agreement expressly incorporated the Non – Solicitation provisions of Mr. Nielsen's Employment Agreement.

46.     It provides:

> 21.  This Agreement constitutes the entire agreement between me and the Company relating to the matters addressed in this Agreement; provided, however, that the applicable terms of my December 1, 2009 Employment Agreement with the Company, including but not limited to **the Confidentiality and Non-Solicitation provisions, shall continue and remain in full force and effect. Ex. B** at ¶ 21 (emphasis added)**.**

47.     The Separation Agreement also contained certain confidentiality provisions:

48.     It provided:

> 4. I acknowledge and agree that I will maintain as confidential, and will not divulge or use in any manner except as authorized in writing and in advance by Company, any and all proprietary or confidential information of the Company or any of its members, benefactors, or  partners, including but not limited to all originals and copies in hard copy or electronic or any other form referring or relating in any way to Company finances, research and development activities, marketing or sales activities, trade secrets, personnel, members, business plans, or other business activities. **Ex. B** at ¶ 4.

49.     The Separation Agreement specifically provides for an award of injunctive relief for violations of the agreement, without the posting of a bond, as well as for an award of attorneys' fees to the Company if it is the prevailing party in any action to enforce its terms.  It provides:

19.   In the event of a breach or threatened breach by me of this Agreement, the Company will be entitled to injunctive relief, without bond, in addition to any other legal or equitable remedies as may be available under law.

\*     \*     \*

20.  In the event that Company brings any lawsuit to enforce the terms of this Agreement and is the prevailing party in such suit, the Company shall be entitled to an award of its reasonable attorneys' fees and costs incurred in connection with that action.

50.     The above provisions of Mr. Nielsen's Separation Agreement and Employment Agreement were material terms of those agreements, and the Company performed its obligations under those agreements, including the payment of Mr. Nielsen's salary, the provision of an additional five months of severance in the amount of $60,978.77, and the provision other benefits upon his separation and the execution of certain releases of claims to Mr. Nielsen in reasonable reliance on his contractual promise to adhere to them.

**Mr. Tyson's and Mr. Thomas' Non-Compete Agreements**

51.     Before the inception of the employment relationship, Big Bus requires every employee to enter into a non-competition agreement (hereinafter, the "Non-Compete Agreement') with the Company as a condition of employment and continued employment.  The non-competition agreement, which is a standard Company form developed over time, contains several covenants placing certain restrictions on directly competitive activities.   These restrictive covenants are designed, and narrowly drawn, to protect the Company's legitimate business interests, including maintaining the secrecy of the Company's proprietary information and preserving the Company's client relationships and goodwill.   They are neither unduly burdensome on the employee's ability to earn a living nor are they against public policy.

52.     This Non-Compete Agreement essentially restricts a departing employee from providing competitive services to an open-top double-decker sightseeing tour bus operation for

the limited period of one year in the Metro-DC area following the conclusion of their employment relationship with Big Bus.

53.     The agreement contains the following definition of prohibited activities:  "The "not to compete" shall mean that the employee shall not directly or indirectly compete with the Company by serving as an officer, owner, partner, director, agent, employee or consultant to any company engaged in a business similar or competitive to the business of Big Bus Tours/Open Top Sightseeing Washington DC. (Please note, for the purpose of this agreement a business similar or competitive to the Company is an open-top double-decker sightseeing tour bus operation.)"

54.     The Non-Compete Agreement is narrowly tailored in limited in geographic scope and time so as to not pose an undue hardship.

55.     It provides that "This agreement shall remain in effect for one year from the employees last day of work for the Company and shall extend to all of Washington DC and surrounding areas."

56.     The Defendant Gabriel Thomas began work as an employee of Big Bus in or about April of 2011.  In October of 2012, he entered into a Non-Compete Agreement with Big Bus, a copy of which is attached hereto as **Exhibit C.**

57.     During his employment for Big Bus, Mr. Thomas served as the Operations Supervisor of Big Bus in a high-level managerial position.  During his employment, he was responsible for the daily working of Big Bus, including the supervision of its street staff, sales agents, drivers, tour guides and dispatchers.

58.      In this position of trust, Mr. Thomas was privy to all the details of Big Bus's inner workings, its customer base, tour routes and commentary, marketing and sales activities,

trade secrets, personnel, business plans, other business activities and other propriety information, including its vendor relationships, distribution and sales networks, as well as the terms of the commission, revenue and sales structure of these engagements.

59.     Mr. Thomas was also privy to pricing and competitive bid information relevant to Big Bus' status as official sightseeing tour of the National Mall.

60.     The Defendant Ricardo Tyson began work as an employee of Big Bus in or about May 9, 2007.  In October of 2012, he entered into a Non-Compete Agreement with Big Bus, a copy of which is attached hereto as **Exhibit D.**

61.     During his employment for Big Bus, Mr. Tyson served as the Senior Dispatch Manager for Big Bus, another high level managerial position.

62.     In this position of trust, Mr. Tyson was privy to myriad details of Big Bus' inner workings, its customer base, tour routes and commentary, marketing and sales activities, trade secrets, personnel, business plans, other business activities and other propriety information.

63.     Mr. Tyson was also privy to pricing and competitive bid information relevant to Big Bus' status as official sightseeing tour of the National Mall.

**Defendants' Anti-Competitive Conduct**

64.     In the fall of 2013, if not earlier, Mr. Nielsen, the former CEO of Big Bus began to take steps to establish a competing company, the Defendant Mr. Sightseeing, LLC.   The Defendant Mr. Sightseeing, LLC was officially organized in October of 2013.  On information and belief, Mr. Sightseeing was established for the purpose of providing open-top, double decker bus sightseeing tours of the Washington DC Metro Area and possibly other localities competing with Big Bus.  On information and belief, Mr. Nielsen is the principle founder and at all relevant times has been in charge of business operations.   The Company's address in

Maryland is 5001 Landon's Bequest Lane, Bowie, MD 20720, which is Mr. Nielsen's home address.  Mr. Nielsen is listed as the CEO of Mr. Sightseeing LLC and has held this position since the company's founding, and on information and belief has been personally involved in the company's creation and marketing efforts.

65.     On the 13th of April 2014, Mr. Sightseeing launched operations with fourteen double decker buses.

66.     Mr. Sightseeing operates in the Washington Metro DC area under the name of CitySights DC.

67.     Mr. Tyson represented to a Big Bus employee in late April of 2014 that he had received a call from Mr. Nielsen soliciting him to come inspect the fleet of buses for CitySights in New York City and to come work for him in as early as December of 2013.

68.     On March 7, 2014, both Mr. Tyson and Mr. Thomas resigned from Big Bus without written notice and let it be known that they were leaving to join a new company.

69.     Both Mr. Thomas and Mr. Tyson have been observed in CitySights uniforms and working on-site at Union Station in April of 2014.

70.     On information and belief, the Defendants Tyson, Thomas and Nielsen, either directly or through Messrs.  Thomas and Tyson then contacted several persons they knew were current Big Bus employees for the purpose of recruiting them to work for Mr. Sightseeing/ City Sights DC. All three Defendants knew that those individuals had signed Non-Compete Agreements with Big Bus agreeing not to engage in certain post-employment competitive business activities and that those solicitations would induce or cause them to violate their contractual obligations.

71.     During the period time from March – April of 2014, eight (8) employees resigned from Big Bus in a mass exodus.

72.      Joseph Fatoma, a driver, resigned on March 6, 2014 without written notice.

73.     Patricia Geiger, a tour guide, resigned on March 15, 2014 without written notice.

74.     Patrick Juwle, a driver, resigned on March 25, 2014 without written notice.

75.     Damon Barret, a driver, abandoned his job on March 25, 2014 and provided no notice.

76.     Lawrence Matthews, a driver, also resigned on March 25, 2014 without providing two weeks' notice.

77.     Elias Desta, a driver, resigned on March 28, 2014, without providing two weeks' notice.

78.     William Wilson, a driver, also resigned on March 28, 2014 without providing two weeks' notice.

79.     Shirley Prince, a driver, left the Company on April 1, 2014.  Copies of these employees' respective Non-Compete agreements are attached at **Exhibit E.**

80.     At all materials times, the Defendants Nielsen, Tyson, Thomas and Mr. Sightseeing were aware of the restrictions on these employees' post-employment competitive business activities because of their respective positions with Big Bus and their own similar covenants with the Company.

81.     On information and belief, all left the employ of Big Bus as a result of the solicitation of and at the behest of Mr. Nielsen, Tyson and/or Thomas to work for Mr. Sightseeing, LLC.

82.     Mr. Sightseeing LLC commenced operations under the name of CitySights DC in the Washington DC metro area in April of 2014.

83.     Since commencing operations, CitySights employees have engaged in open harassment of potential customers or tourists who select a Big Bus tour as well as the drivers and employees of Big Bus.

84.     CitySights employees also stop in areas on the National Mall where Big Bus is the official concessioner and attempt to pick up potential Big Bus customers, although they are not authorized to do so.

85.     City Sights has also sold "child" tickets to adult customers in violation of the applicable tariffs to improperly undercut Big Bus sales.

86.     CitySights illegally parks its buses in the fire lane at Union Station so as to improperly "cut off" Big Bus' access to customers who thereby encounter CitySight's buses first upon exiting the station.

87.     CitySights painted its kiosk maroon to mimic the color and trade dress of Big Bus' fleet of buses so that customers would be confused as to the identity of the tour bus company for which they were purchasing tickets.  On information and belief, this color scheme has caused actual confusion among customers.

88.     On information and belief, CitySights employees have honored pre-paid vouchers for Big Bus rides so as to steal business from Big Bus and further confuse customers.

89.     CitySights recently launched a public website for the purpose of marketing and selling its services to the general public.  For a period of time, CitySights website contained content virtually identical to content already contained on Open Top SightSeeing's website. It also mimics Big Bus' website's overall style and appearance.  On information and belief, Mr.

Sightseeing, with the involvement of Mr. Nielsen and others, intentionally copied the content of Open Top Sightseeing's website for use on Mr. Sightseeing's website.   Indeed, one tab accidentally listed Mr. Sightseeing as "Open Top Sightseeing" suggesting that the content had been directly cut and pasted.

90.     CitySights DC's website also contains deliberately false information.   For example, CitySights DC claims to be the first company to establish the world famous Hop On Hop Off with Open Top Double Decker buses in Washington D.C. This is literally false.

91.      CitySights DC also claims to provide these services via "brand new state-of-the-art buses that meets all the modern safety standards and for your comfort is heated in the winter time and air conditioned in the summer time."  This is also literally false.

92.     In addition, CitySights claims to be the "recognized leader" in Washington DC Sightseeing tours and attractions.  This is also untrue.

93.     CitySights DC is not the first company, they have only just started their business, their buses are not brand new, they are converted public transit buses and the safety standards are dubious at best.

## COUNT I
### Breach of Employment Agreement/Employee Solicitation
(Against Defendant Nielsen)

94.     Big Bus incorporates by reference paragraphs 1 through 93 above as if fully set forth herein.

95.     The Employment Agreement constituted a valid and binding contractual relationship between Big Bus and Mr. Nielsen, and placed certain reasonable and enforceable restraints on his conduct during and after his employment with the Company.

96.     Big Bus fully performed its obligations under the Employment Agreement.

97.     Pursuant to the Employment Agreement, Mr. Neilsen contractually promised Big Bus that for a period of two years following the termination of his employment with the Company, he would not hire or engage, or attempt to hire or engage, any individual who was an employee or consultant of the Company at any time during the two year period immediately preceding the termination of Mr. Neilsen's employment with the Company.  (Employment Agreement, Section 6.3.)

98.     Mr. Neilsen solicited certain individuals, who were currently employed by Big Bus during the two year period immediately preceding Mr. Nielsen's termination of employment with the Company, for the purpose of inducing such individuals to resign their employment with Big Bus and accept employment with Mr. Nielsen and/or his newly formed company.  Mr. Neilsen engaged in these activities during the two-year period immediately following the termination of his employment with Big Bus.

99.     Mr. Neilsen, through his above-described conduct, materially breached his contractual duties owed to Big Bus under Section 6.3 of the Employment Agreement.

100.    Big Bus has suffered, and will continue to suffer, damages as a result of Mr. Nielsen's material breaches of the Employment Agreement.

101.    Big Bus is entitled to recover compensatory damages from Mr. Nielsen as a result of his material breaches of his Employment Agreement.

102.    Under the express terms of the Employment Agreement, Big Bus is also entitled to injunctive relief to prevent Mr. Neilsen' continued material breaches of his contractual obligations.

**COUNT II**
**Breach of Separation Agreement/Employee Solicitation**
(Against Defendant Nielsen)

103.   Big Bus incorporates by reference paragraphs 1 through 93 above as if fully set forth herein.

104.   The Separation Agreement constituted a valid and binding contractual relationship between Big Bus and Mr. Nielsen, and placed certain reasonable and enforceable restraints on his conduct after his employment with the Company.

105.   Big Bus fully performed its obligations under the Separation Agreement.

106.   Pursuant to the Separation Agreement, Mr. Neilsen contractually promised Big Bus that for a period of two years following the termination of his employment with the Company, he would not hire or engage, or attempt to hire or engage, any individual who was an employee or consultant of the Company at any time during the two year period immediately preceding the termination of Mr. Neilsen's employment with the Company.   (Separation Agreement ¶ 21 incorporating Employment Agreement, Section 6.3.)

107.   Mr. Neilsen solicited certain individuals, who were currently employed by Big Bus during the two year period immediately preceding Mr. Nielsen's termination of employment with the Company, for the purpose of inducing such individuals to resign their employment with the Company and accept employment with Mr. Nielsen and/or his newly formed company.   Mr. Neilsen engaged in these activities during the two-year period immediately following the termination of his employment with Big Bus.

108.   Mr. Neilsen, through his above-described conduct, materially breached his contractual duties owed to Big Bus under Paragraph 21 of the Separation Agreement.

109.    Big Bus has suffered, and will continue to suffer, damages as a result of Mr. Nielsen's material breaches of the Separation Agreement.

110.    Big Bus is entitled to recover compensatory damages from Mr. Nielsen as a result of his material breaches of the Separation Agreement.

111.    Under the express terms of the Separation Agreement, Big Bus is entitled to injunctive relief to prevent Mr. Nielsen's continued material breaches of his contractual obligations.  Separation Agreement at ¶ 19.

112.    Under the express terms of the Separation Agreement, Big Bus is also entitled to its attorneys' fees and the costs.  Separation Agreement at ¶ 20.

**COUNT III**
**Breach of Non-Compete Agreement**
(Against Mr. Tyson and Mr. Thomas)

113.    Big Bus incorporates by reference paragraphs 1 through 93 above as if fully set forth herein.

114.    The Non-Compete Agreement signed by Defendants Thomas and Tyson constituted a valid and binding contractual relationship between Big Bus and Messrs. Thomas and Tyson, and placed certain reasonable and enforceable restraints on their conduct after their employment with the Company.

115.    Big Bus fully performed its obligations under the Non-Compete Agreement by continuing to employ Messrs. Thomas and Tyson in reliance on their covenants and representations.

116.    Pursuant to their Non-Compete Agreements, Mr. Thomas and Mr. Tyson contractually promised Big Bus that they would not compete directly or indirectly with the Company "by serving as an officer, owner, partner, director, agent, employee or consultant to

18

any company engaged in a business similar or competitive to the business of Big Bus Tours/Open Top Sightseeing Washington DC," *i.e.,* "an open-top double-decker sightseeing tour bus operation."

117.    This restriction was temporally limited to a period of one year immediately following the employee's last day of work, and geographically limited to Washington DC and the surrounding areas.

118.    Messrs. Tyson and Thomas, through their above-described conduct, materially breached their contractual duties owed to Big Bus under their respective Non-Compete Agreements.

119.    Big Bus has suffered, and will continue to suffer, damages as a result of Messrs. Tyson's and Thomas' material breaches of their Non –Compete Agreements.

120.    Big Bus is entitled to recover compensatory damages from Messrs. Thomas and Tyson as a result of their material breaches of their Non –Compete Agreements.

121.    Big Bus also seeks injunctive relief to prevent Messrs. Thomas's and Tyson's continued material breaches of their contractual obligations.

**COUNT IV**
**Breach of Separation Agreement/Proprietary Information**
(Against Nielsen)

122.    Big Bus incorporates by reference paragraphs 1 through 93 above as if fully set forth herein.

123.    The Separation Agreement constituted a valid and binding contractual relationship between Big Bus and Mr. Nielsen, and placed certain reasonable and enforceable restraints on Mr. Neilsen's conduct during and after his employment with the Company.

124.    Big Bus fully performed its obligations under the Separation Agreement.

19

125.     Pursuant to the Separation Agreement, Mr. Nielsen contractually promised Big Bus that he would adhere to the Company's policies and practices to protect the confidentiality of its propriety information, and, in reliance on these promises, Mr. Nielsen was given access to this information and allowed to retain possession of the Company laptop.

126.     On information and belief, Mr. Neilsen, through his above-described conduct, materially breached his contractual duties owed to Big Bus under the Separation Agreement by using Big Bus' propriety and commercial information to establish a competing company.

127.     Big Bus has suffered, and will continue to suffer, damages as a result of Mr. Neilsen' material breaches of the Employment Agreement.

128.     Big Bus is entitled to recover compensatory damages from Mr. Neilsen as a result of his material breaches of the Employment Agreement.

129.     Under the express terms of the Employment Agreement, Big Bus is entitled to injunctive relief to prevent Mr. Neilsen' continued material breaches of his contractual obligations.

## COUNT V
### Breach of Common Law Duty of Loyalty
(Against Messrs. Thomas and Tyson)

130.     Big Bus incorporates by reference paragraphs 1 through 93 above as if fully set forth herein.

131.     At all times during their employment with Big Bus, by virtue of their high level managerial positions, they owed the Company a common law duty of loyalty to Big Bus which included refrainment from soliciting the Company's employees, competing with the Company, misappropriating or otherwise misusing the Company's confidential information, withholding or concealing from the Company information that would be useful to the Company's protection

and pursuit of its business interests, and otherwise taking actions adverse to the Company's interests.

132.    During their employment with Big Bus, Messrs. Thomas and Tyson solicited the Company's employees, and withheld and concealed from the Company information that would be useful to the Company's protection and pursuit of its business interests (including their solicitation of its employees and their competition with the Company), and took other actions adverse to the Company's interests.

133.    Messrs. Thomas and Tyson, by engaging in the above-described conduct, breached their duty of loyalty to Big Bus.

134.    Messrs. Thomas and Tyson undertook their wrongful actions with full knowledge, intentionally, purposefully, willfully, wantonly, maliciously, without authority or lawful justification, and in conscious disregard of Big Bus' rights.  Messrs. Thomas and Tyson undertook these wrongful actions for the primary purpose of harming Big Bus' business interests.  At a minimum, Messrs. Thomas and Tyson knew that their wrongful actions would be certain or substantially certain to harm Big Bus' business interests.

135.    Big Bus has suffered, and will continue to suffer, damages as a result of Messrs. Thomas and Tyson' breaches of their duty of loyalty.

136.    Big Bus is entitled to recover compensatory damages from Messrs. Thomas and Tyson as a result of their breach of their duty of loyalty.

137.    Big Bus is entitled to recover punitive damages from Messrs. Thomas and Tyson as a result of their willful and malicious breach of their duty of loyalty.

**COUNT VI**
**Tortious Interference with Non –Compete Agreement**
(Against Mr. Nielsen and Mr. SightSeeing, LLC)

138.   Big Bus incorporates by reference paragraphs 1 through 93 above as if fully set forth herein.

139.   The Non-Compete Agreement constituted a valid and binding contractual relationship between Big Bus and its employees.

140.   Mr. Sightseeing LLC, through its officer, Mr. Nielsen, was aware of the Non-Compete Agreement.

141.   Mr. Sightseeing LLC and Mr. Nielsen wrongfully interfered with the Non-Compete Agreement, including inducing and causing Messrs. Tyson and Thomas and the other employees enumerated above to violate their non-compete obligations.

142.   Mr. Sightseeing's and Mr. Nielsen's wrongful interference is ongoing.

143.   Mr. Sightseeing and Mr. Nielsen undertook their wrongful actions with full knowledge, intentionally, purposefully, willfully, wantonly, maliciously, without authority or lawful justification, in conscious disregard of Big Bus' rights.  Mr. Sightseeing and Mr. Nielsen undertook their wrongful actions for the primary purpose of interfering with these employees' performance of their contractual duties owed to Big Bus.  At a minimum, Mr. Sightseeing and Mr. Nielsen knew that their wrongful actions would be certain or substantially certain to cause this interference.

144.   Mr. Sightseeing's and Mr. Nielsen's interference with the Non-Compete Agreement included the use of independently tortious conduct and violations of recognized common law, including misappropriation and conversion of Big Bus' proprietary information and unfair competition.

145.    Big Bus has suffered, and will continue to suffer, damages as a direct result of Mr. Sightseeing's and Mr. Nielsen's intentional interference with the Non-Compete Agreement.

146.    Big Bus is entitled to recover compensatory damages from Mr. Sightseeing and Mr. Nielsen as a result of their intentional interference with its Non-Compete agreements.

147.    Big Bus is entitled to recover punitive damages from Mr. Sightseeing and Mr. Nielsen as a result of their willful and malicious interference with its contracts.

**COUNT VII**
**Misappropriation of Trade Secrets**
**D.C. Code §§ 36-401 through 36-410 (2011)**
(Against Mr. Nielsen and Mr. SightSeeing, LLC)

148.    Big Bus incorporates by reference paragraphs 1 through 93 above as if fully set forth herein.

149.    Big Bus possessed extremely sensitive confidential and proprietary information to which Mr. Neilsen had access in the course and scope of his employment, including patterns, methods, techniques, and processes relating to: Big Bus' services and operations; sales and marketing; pricing; clients' and potential clients' needs, preferences, behavior, and plans; business leads and potential clients; strategies and plans for promoting and selling its services; tours, routes, workforce and personnel; employee training, experience, skills, qualifications, tenure and career plans, compensation and benefits, and expectations and demands.

150.    The foregoing information derives both actual and potential independent economic value, and is neither generally known to other persons or entities nor readily ascertainable by other persons or entities who can obtain economic value from its disclosure or use.  Big Bus has made reasonable efforts to maintain the secrecy and confidentiality of this information.

151.    Mr. Nielsen had a duty to maintain the secrecy of the foregoing trade secrets, to limit their use, and to prevent their unauthorized acquisition, use or disclosure.

152.    Mr. Nielsen acquired the foregoing trade secrets in a manner and for a purpose outside the course and scope of, and in conflict with, his employment with Big Bus.  He acquired some or all of the foregoing trade secrets by theft, misrepresentation, and/or breach of his duty to protect the trade secrets' secrecy, use, acquisition and disclosure, or with knowledge or reason to know that such acquisition was by theft, misrepresentation, and/or breach of his duty to protect the trade secrets' secrecy, use, acquisition and disclosure.

153.    Mr. Nielsen used and/or disclosed the foregoing trade secrets without Big Bus' express or implied consent, and on behalf of and/or for the benefit of himself, and/or Mr. Sightseeing LLC.

154.    Mr. Sightseeing wrongfully accepted and acquired Big Bus' trade secrets from Mr. Nielsen, with knowledge that he had acquired them by improper means and that he had a duty to protect their secrecy, use and disclosure.

155.    Mr. Sightseeing also intentionally copied Open Top Sightseeing's website and misappropriated its content.

156.    Defendants continue to possess and use Big Bus' trade secrets without Big Bus' consent or authorization.

157.    Defendants undertook, and continue to take, these wrongful actions with full knowledge, intentionally, purposefully, willfully, wantonly, maliciously, without authority or lawful justification, and in conscious disregard of Big Bus' rights.

158.    Big Bus has suffered, and will continue to suffer, significant damages as a result of Defendants' misappropriation of its trade secrets.

24

159.    Defendants are liable to Big Bus for compensatory damages, pursuant to D.C. Code §36-403(2011).

160.    Big Bus is entitled to injunctive relief against Defendants for the actual or threatened misappropriation of its trade secrets, pursuant to D.C. Code § 36-402 (2011).

161.    Big Bus is entitled to punitive damages and recovery of its costs and attorneys' fees from Defendants due to their willful and malicious misappropriation of its trade secrets, pursuant to D.C. Code §§ 36-403 and 404 (2011).

## COUNT VIII
### (Tortious Interference with Contracts)
### (Against Defendants, Tyson and Thomas)

162.    Big Bus incorporates and realleges paragraphs 1 - 94 of the Complaint as if fully set forth herein.

163.    Big Bus had a contractual relationship with their employees in the form of a Non-Compete agreement, which had a period of performance for one year after the termination of their employment

164.    Defendants had knowledge of these contracts.

165.    Defendants intentionally and tortiously interfered with these contracts, which resulted in the breach of those contracts and damages to Big Bus.   The methods by which Defendants interfered, as alleged above, have been improper and consisted of, among other things, sharp dealing, unfair competition, and misappropriation of trade secrets.

166.    Defendants' tortious interference has been willful, wanton, and in malicious disregard of Big Bus' rights.

167.    As a direct and proximate result of Defendant's tortious interference, Big Bus has suffered damages, the full extent of which are not yet known, but which are believed to be at least $400,000.


**COUNT IX**
**(Tortious Interference with Business Expectancies)**
**(Against all Defendants)**

168.    Big Bus incorporates and realleges paragraphs 1 - 93 of the Complaint as if fully set forth herein.

169.    Big Bus had business relationships and expectancies with its customers with a reasonable probability of future economic benefit to Big Bus.

170.    Big Bus reasonably expected to maintain and continue its business relationship and expectancy with its customers based on its successful record of performance, its incumbent status as the authorized concessioner of the National Mall, and the dedication of appropriate staff to continue business operations at previous capacity.

171.    The Defendants had knowledge of Big Bus' expectancy to continue the work and of the probability of future economic benefit to Big Bus from this relationship and expectancy.

172.    It was reasonably certain that, but for the Defendants' intentional and tortious interference, Big Bus would realize its business expectancy by continuing to provide service to its customers and maintain current operating capacity.

173.    The methods by which the Defendants have interfered, as alleged above, have been improper and consisted of, among other things, sharp dealing, unfair competition, and misappropriation of trade secrets.

174.    The Defendants' tortious interference has been willful, wanton, and in malicious disregard of Big Bus' rights.

26

175.    As a direct and proximate result of Defendants' tortious interference with the Big Bus' legitimate business expectancies, Big Bus has suffered damages, the full extent of which are not yet known, but which are believed to be at least One Hundred Thousand Dollars ($100,000.00.)

**COUNT X**
**(Violation of Lanham Act- Confusion of Origin)**
**(Against all Defendants)**

176.    Big Bus incorporates and realleges paragraphs 1 - 93 of the Complaint as if fully set forth herein.

177.    By mimicking the look and feel of Big Bus kiosks, and by including on its website content that was virtually identical to the content on Open Top SightSeeing's website, and by stopping in areas where CitySights is not authorized to operate but Big Bus is and attempting to pick up potential customers, and by accepting vouchers for Big Bus' services defendants have used and are using in commerce words, terms, names, symbols, or devices, or a combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion or mistake among customers, or to deceive customers as to the origin or sponsorship of CitySights services or commercial activities.

178.    Defendants have taken these actions intentionally to cause such confusion among consumers, specifically including Big Bus's customers and potential customers.

179.    Upon information and belief, defendants have succeeded in causing such confusion among consumers.

180.    Defendant's actions thus violate 15 U.S.C. § 1125.

181.    Based on defendant's violation, under 15 U.S.C. § 1117(a), plaintiff is entitled to

an award of defendant's profits, plaintiff's damages, trebled, and the costs of this action.  In addition, because defendant's actions were intentional and this case exceptional, plaintiff also requests an award of its attorneys' fees.

### COUNT XI
### (Violation of Lanham Act- False Advertising)
### (Against all Defendants)

182.    Big Bus incorporates and realleges paragraphs 1 - 93 of the Complaint as if fully set forth herein.

183.    Defendants have also made false and misleading representations to the public, misrepresenting the nature of their services in violation of Section 43(a)(1)(B) of the Lanham Act.

184.    Defendants made statements of fact in their commercial advertising promotions that were (1) false or misleading, (2) actually or likely deceptive to a substantial segment of potential customers, (3) material in their effects on buying decisions, (4) connected with interstate commerce, and (5) actually or likely injurious to Big Bus.

185.    Defendant's actions thus violate 15 U.S.C. § 1125.

186.    Based on defendants' violation, under 15 U.S.C. § 1117(a), plaintiff is entitled to an award of defendant's profits, plaintiff's damages, trebled, and the costs of this action.  In addition, because defendant's actions were intentional and this case exceptional, plaintiff also requests an award of its attorneys' fees.

### **PRAYER FOR RELIEF**

WHEREFORE, based upon the foregoing allegations and claims, Plaintiff Big Bus prays that the Court award it the following relief:

28

1.      Permanent injunctive relief against Defendants, Tyson and Thomas prohibiting them from: (a) competing directly or indirectly with Big Bus in the Washington DC area for a period of  one year from the entry of judgment; and (b) against Defendants Nielsen and Mr. Sightseeing to prevent them from maintaining, using or disclosing any information containing or comprising Big Bus' trade secrets and confidential and proprietary information; and (c) hiring or engaging, or attempting to hire or engage, any person who at the time is a current Big Bus employee or consultant or had been a Big Bus employee or consultant in the preceding one-year period, for a period of one year from the entry of judgment; and (d) engaging in any conduct for the purpose of injuring Big Bus' reputation or business.

2.      An order compelling Defendants to: (a) surrender and return all of Big Bus' trade secrets and confidential and proprietary information, and all property, documents or data belonging to Big Bus; (b) surrender and disclose all documents evidencing their use of Big Bus' trade secrets and confidential and proprietary information; (c) specifically account for their use and disclosure of Big Bus' trade secrets and confidential and proprietary information; (d) identify and disgorge all profits they have received or will receive from the above-described misconduct.

3.      An order imposing a constructive trust for said unlawful profits.

4.      An award of compensatory damages against Mr. Nielsen under Counts I, II, IV in an amount to be determined upon trial, but not less than $200,000.00.

5.      An award of compensatory damages against Messrs. Tyson and Thomas under Count III and V in an amount to be determined upon trial, but not less than $500,000.00.

6.      An award of compensatory damages against Mr. Sightseeing and Mr. Nielsen under Count VI, in an amount to be determined upon trial, but not less than $600,000.00.

29

7.    An award of compensatory damages against Mr. Nielsen and Mr. Sightseeing under Counts VII in an amount to be determined upon trial, but not less than $100,000.00.

8.    An award of punitive damages against Mr. Sight Seeing and Mr. Nielsen under Counts VI and VII, in an amount to be determined by the trier of fact.

9.    An award of compensatory damages against Defendants Thomas and Tyson under Count VIII, in an amount to be determined upon trial, but not less than $400,000.00.

10.    An award of punitive damages against all Defendants Thomas and Tyson under Counts VIII in an amount to be determined by the trier of fact.

11.    An award of compensatory damages against all defendants under Count IX, in an amount to be determined upon trial, but not less than $100,000.00.

12.    Injunctive relief and an award of defendant's profits and plaintiff's actual damages in an amount to be determined upon trial, trebled, under Count X.

13.    Injunctive relief and an award of defendant's profits and plaintiff's actual damages in an amount to be determined upon trial, trebled, under Count XI.

14.    Recovery of Big Bus' costs and attorneys' fees.

15.    Pre- and post-judgment interest on all damages awarded.

16.    Such other relief that this Court finds just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff Big Bus demands a jury trial on all issues so triable.

Dated:  May 19, 2014                          Respectfully submitted,


       /s/ David Barger
David G. Barger (DC 469098)
Theresa A. Queen (DC 483644)[1]
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1200
McLean, Virginia  22102
Tel: (703) 749-1300
Fax: (703) 749-1301
queent@gtlaw.com
bargerd@gtlaw.com
*Counsel for Plaintiff Big Bus Tours*

---

[1] Pursuant to LCvR 5.1(e)(2),  Ms. Queen's application to this Court for admission is currently pending.

## **VERIFICATION**

I solemnly affirm under penalties of perjury that the factual allegations set forth in the
Complaint are true to the best of my knowledge, information and belief.

Jay Kelly, General Manager

*TCO 360792454v1*